Good morning, and welcome to the 11th Circuit. We are excited to have everybody here today, and we're just going to go through a quick reminder on our timing signals. I'm sure you're all familiar with it, but when the red light comes on, that means your time is up. And so please conclude your argument at that time, or earlier, if you wish. Obviously, if we've answered those questions, and so if it takes you over the red light, then please continue until you've answered the question. All right, and with that, we will proceed with our first case today, that is United States of America v. Victor Hill. And we'll hear first from Counsel Barron. Madam Chief Judge, your honors, on behalf of my co-counsel, Truth-Funding and Law Center Berg, my name is Lindsay Barron, and we represent Victor Hill v. Appellant. This case is not really about Victor Hill and his use of the restraint chair at the Clayton County Jail. It is about the limits of prosecutorial power and whether prosecutors can chart new territory in defining what constitutes excessive force by way of a criminal prosecution. The due process clause in the Constitution says no. Even the district court at sentencing noted the novelty of this case in this prosecution, and that she could not even find a civil case where someone had been held liable for so little, which may explain why she varied down by more than 60% at sentencing. The judge struggled with this case, the jury struggled with this case, and the reason why is because it never should have gone to trial. But even if this court is not inclined to side with us on the due process issue, it should still reverse and remand for a new trial because there was a holdout juror who changed his vote to reach a unanimous verdict based on coercion from the judge. You're reading a lot into the record, right, to say there was a holdout juror who changed his vote under coercion from the judge? Well, I'm reading into your question, Your Honor, but are you saying that I'm reading into it by saying there was, in fact, one holdout and that we knew who that person was? Yeah. Okay. So the record actually makes pretty clear. The judge even says, and this is cited in our brief early on, that there is one that we received these notes, and there was this one juror who the notes were talking about, and the judge stated on the record that we think we know who this person is. But even if it wasn't clear at that point, But I guess those two things are not necessarily the same, right? There was a problematic juror who was saying these weird things, but can we necessarily assume that that juror was also the holdout juror? Well, any doubt about that is resolved at the point that that juror is called out to be questioned on the record. So right before he is called out, the foreperson comes out and is asked to talk about the notes. Is this person deliberating? Is this person engaging? And then that holdout juror who is asked his name on the record comes out in a public courtroom and explains why he is disagreeing with the majority. So at that point, we know that there is disagreement, and he tells us what his specific points of argument are with the majority. He sees the law one way. They see it another way. They want him to answer simple yes or no questions, and he states on the record, I just don't see the world in black and white. I don't see it as yes or no. And so at that point, we know exactly who the holdout is. And the notes continue after that point to talk about this one juror and issues that the other jurors perceived him to have. So would the court prefer me to stay on the juror issue or go back to the due process issue? It's your argument. Thank you. I do want to talk about the due process issue because we believe that— But I did want you to save some time to go back to the jury question. Okay. Well, let me go ahead and answer the questions now if the court wants me to. We'll deal with that now if the court has to say— No, I—speaking for myself, it struck me that the most serious issue in this case was the jury question. I understand, Your Honor. I mean, we still ask for reversal on the— No, I understand. Okay. And I didn't mean to sidetrack you, but I just wanted to make sure you spent some time on this question of bringing the juror in twice. I will, Your Honor. But I want to address the due process issue very briefly, if I may, because that's the basis on which this case would never get retried, and that's what we would prefer in terms of the opinion. And the reason why we think it requires reversal is that the basis on which the government is relying to show that my client had fair warning that his conduct was criminal is that prong under Lanier, which states that warning can come from a broad statement of law which applies with obvious clarity to these facts. And we don't disagree with them on what that broad statement of law is. Law enforcement officers cannot use substantial force on someone who has stopped resisting. What we disagree on is whether that rule applies with obvious clarity in the passive restraint context or whether there is a material distinction between restraint and the brute force that is at issue in this Court's prior cases. But we've said, I mean, we've said handcuffs are considered a form of force. What's the difference between handcuffs and a restraint chair? Well, our argument is that there really isn't much of a material difference when we're looking at restraint. So let's consider restraint devices a bucket. So waist chains, leg irons, handcuffs, the safety restraint chair, those are materially different than the types of force at issue in the previous cases. And this Court said as much in Crocker v. Beatty. In specifically distinguishing that case where a man was handcuffed in a hot police car with the air conditioner off, this Court specifically said, in contrasting those facts to Danley v. Allen, that, and I'm quoting here, the use of force in Crocker is altogether different from the pepper spray that was at issue in Danley v. Allen. And there is a material difference between restraint cases and brute force cases, and this Court's case law consistently bears that out. In the handcuffing context, cases that the government relies on, Gold v. City of Miami and Rodriguez v. Ferrell, we're talking about cases where the individuals were not resisting, were handcuffed, and one of them, in Gold, actually suffers abrasions on his arms, much like the ones the government relies on here. That's the kind of pain that he suffered. In Rodriguez, the man had had shoulder surgery, and his arm was twisted behind his back, very painfully. He screamed out in pain, had to have further surgeries because of that twisting. This Court reversed the denial of qualified immunity in both of those cases because, again, if we're looking at the Kingsley factors and the sliding scale, the amount of force used there and the amount of injury, which was de minimis, did not show an obvious violation of the Constitution. But, Your Honor, the kill shot here is Myrick v. Fulton County, and that's the case that we've supplemented with recently. So, in Myrick, there was a restraint chair. The individual was being disruptive. He was not complying with demands. He is handcuffed, he is shackled, and then he is put in a restraint chair. Myrick does or does not post-date the events in question? The events in Myrick were in 2008. The decision? The decision post-date. What about Piazza and Piazza's characterization of Williams? It, you know, sort of lists Williams in this series of things, you know, sort of kicks, punches, pepper spray, whatever it is. Kicks, punches, pepper spray, tases, what you would call brute force, and then it says and four-point restraint. Yes, Your Honor. So, that is the universe of law on which the government relies to show that there is no material difference with restraint chairs. That site, which is in Dictum, in Piazza, to Williams. But remember Williams, and we talk about this in our brief, Williams is a case in which this court affirmed the grant of qualified immunity. And also in that case, this court declined to say that the four-point restraint was even excessive force. It reaffirmed the mandate from the Supreme Court in Belvey-Wolfish that tremendous discretion should be given to people, to officers in a correctional environment. Of course, the problem that you have in this case is there was a whole bunch of evidence that suggested that the restraint chair, let's assume for a moment it was force of some kind, that it was purely punitive in nature. That is to say, there certainly was evidence from which the jury could have found, as it posed no threat of any kind at the time the restraints were imposed. And they had not been convicted of anything. These were pre-trial detainees starting out with the presumption of innocence. And here he did, he threw them in a chair for four plus hours and six successive occasions without any reason to believe that they were dangerous. They certainly didn't act up, et cetera. It seems to me that's a big problem that you have to circumnavigate. So two responses, Your Honor. First of all, you're correct to point out that that's the evidence at trial. But our argument is about the district court's failure to grant the motion to dismiss. This is a question of law. Was there sufficient evidence that he would have been on notice that restraint is in the same category as other types of brute force that are discussed in this court? What about the, let me ask you this, what about the case where the Supreme Court had earlier decided where a guy was convicted, he was on a chain gang in Alabama in the summer, and he's acting up and they hitch him to a post for eight hours in the sun. Supreme Court, there's no case on point. Supreme Court says you don't really need a case in point in that circumstance. It was obviously punitive in nature. It's a little different. The time frame was different. It was outside rather than inside. But provided some background for an officer to know there were some things he couldn't do, even if there wasn't a case squarely on point. Correct. I'm going to address the court's question first, and then if I may, I'd like to come back to the second point I was going to make in response to the court's previous question. So that case is Hope v. Pelzer, and it's the hitching post case. So two things are important there. The Justice Department had previously done a pattern and practice review of Limestone Facility's use of that hitching post and told the officers that it believed it to be unconstitutional. But the second relevant point is that a hitching post does not have any inherent law enforcement purpose. A safety restraint chair is fundamentally different. But that's, I mean, not necessarily, right? If the only purpose that you're using the restraint chair is for a purpose that is not authorized and that may not be in furtherance of any kind of legitimate penological interest, then how is it any different from a hitching post? I think that that is the problem with the government's case because it kind of begs the question, is a safety restraint chair ever, does it ever have a lawful penological purpose? That question was never answered by the government. I mean, I think the answer to that is obviously yes, right? I mean, the answer to that is that there are legitimate penological purposes for a restraint chair, and those are the ones that are outlined in the policy that your client established, right? I mean, your client established a policy saying that the chairs were, quote, for emergencies such as, quote, safe containment of an inmate exhibiting violent or uncontrollable behavior, and, quote, to prevent self-injury, injury to others, or property damage, unquote. And then he also said that the chair use would, quote, never be authorized as a form of punishment, unquote. Correct. So he recognized all of those things. And this ties into Judge Marcus's question earlier about piazza and punitive intent and the evidence of punitive intent. And I do want to address that if the court will allow me. I know I'm over my time. But regarding that policy, I think the operative word there in the two clauses that Your Honor read is or. So has to be exhibiting violent behavior or can be used preventatively. And that was our argument at trial, that a safety restraint chair is authorized to be used preventatively even in the absence of a demonstration of violence. That is a lawful purpose. But that is a use that the jury construed your client was not engaged in. And that, I mean, seems like there's sufficient evidence to uphold that. For example, maybe you want to address this. In the one instance with a 17-year-old kid where the officer said that he had put him under arrest and asked what to do with him, and there was no indication whatsoever that there were any kinds of problems of resistance, there's a one-word text back, and it just says chair. Can you explain how that is? Sure. How the jury couldn't construe that as not preventative but rather punitive? Sure. And I do want to reinforce that in answering the question on the motion to dismiss, the trial evidence really is not probative. That's a question of law. But to address the evidence of punitive intent nonetheless, this court made it clear in Crocker v. Beatty. And, you know, the prejudicial statements from my client, the things that Judge Marcus referred to seems to suggest that there was a punitive intent. We dispute that. But even if this court decides that there was a punitive intent and that's the only reason it was used, Crocker v. Beatty tells us that the question of punitive intent and what was in my client's mind is only relevant in a conditions of confinement case. When we're talking about excessive force amounting to punishment, that is a different kind of excessive force situation in which punitive intent does not matter. The only question is whether the conduct was objectively reasonable, and that's where the law comes out on our side. If we look at passive restraint cases from this court, it is not clearly established, and I want to quote directly from Myrick here, this court's case law tends to indicate that the use of restraints is permissible. The court went even further. Additional restraints, handcuffs and leg irons, on top of the restraint chair in that case was not so obviously unconstitutional that any officer would have had fair warning. And so if we want to say that the restraint chair is not like handcuffs, it can be used here but not there, and if you use it in this context, then it's unconstitutional, that's fine. But those contours were not outlined by this court's law. The broad state of the area— I'm sorry to interrupt, but these are detainees, right? They're pretrial detainees. They haven't been convicted of anything. And your argument is that it was not clearly established that an officer couldn't put somebody, and let's just say it was completely cooperative and showed no signs of resistance, into a restraint chair who was a pretrial detainee for at least four hours, not give them bathroom breaks and not have medics attend to them. Well, your record disputes the last two facts. But again, there is evidence that goes the other way and a jury found against your client, so we have to accept the evidence in the light most favorable to the verdict. So going back to the question of law, Your Honor, and whether it is my position that a person could put someone in a restraint chair for a purely punitive purpose, and again, we don't concede that that's what happens, but the answer is yes. If we read Crocker v. Beatty, it is clear. In that case, there was an express punitive intent. That person is put in the back of the police car. The air conditioner is turned off in South Florida. The man complains, and the officer says, Sir, this is not supposed to be comfortable. And this court found that even in that situation where someone, this appears to be punitive, it appears to be retaliatory because he hasn't given the officers the cell phone they had asked for. Nonetheless, the conduct was not itself objectively unreasonable. And so punitive intent in the excessive force amounting to punishment arena, under this court's established case law in Crocker, which the government doesn't even address in their brief, says that yes, if the conduct is objectively unreasonable, punitive intent doesn't matter. And so our position is that there is no case law from this court making it clear that restraint is objectively unreasonable, that it could ever amount to excessive force. Maybe that's the direction the court wants to go, but that's not where it was in 2020 and 21 when my client is alleged to have violated the constitutional rights. Thank you, Your Honor. Thank you, counsel. All right, we'll hear next from Attorney Hobson. Thank you, Your Honor. May it please the Court, my name is Brett Hobson and I represent the United States. This court should affirm Mr. Hill's convictions because there was longstanding precedent to put Mr. Hill on notice that his actions violated the detainee's constitutional rights and because the district court did not abuse his discretion during the jury deliberations. Can I start out by asking you if you want to address Crocker? Yes, Your Honor. So the reason I didn't really address Crocker is it's just not even close to on point. In Crocker, it's an arrest situation where this court has said repeatedly some force is inherent in an arrest. And so the fact that the man was in cuffs in the back of the car for half an hour on an 85-degree day was viewed as the minimus force that was just inherent in the arrest situation. That's very different than what we have here, which is no reason for the force. There was absolutely no justification. These are, as Your Honor mentioned, pre-trial detainees. They have not been convicted of anything. They're in the custody of the sheriff and it is undisputed. None of them were resisting. There was no reason for force whatsoever. And so we're just in a completely different world than Crocker. Can I ask you another sort of threshold question? Is it your position that every use of passive restraints in chair, handcuffs, leg irons, whatever, is subject to an excessiveness challenge? And if used on someone who has not yet threatened sort of the public peace, is excessive? No, Your Honor. There is some minimus level of force this court has talked about. But the real question, and it's not about intent. We won't say that intent is irrelevant. Intent comes in in the Kingsley factors. You're balancing the need with the amount of force. I guess let me just sort of like break it down. So is it your position that the use of passive restraints, let's say handcuffs, is force? Yes, Your Honor. And is it also your position that the use of force against a compliant, non-disturbing individual is excessive? No. OK, tell me about that. The difference is when there is absolutely no reason for it. There's no non-punitive government purpose. And so the example that the defense likes to bring up in the brief and has talked about quite a bit is this is going to put all the marshals in trouble because they use handcuffs to get people to court. And when they're sitting in the court waiting for court, the difference there is there is a purpose for that. And as Judge Rosenbaum mentioned, there's a purpose for the restraint chair sometimes. When someone is acting out, they are a danger to themselves or others, then you can use the restraint chair. When you're transporting someone, you can use handcuffs to make sure that they're in a safe position. That's not what we have here. What we have here is nobody is even arguing that these people were resisting. In three of the cases which were on video, the sheriff himself admits he decided before they ever got to the jail to put them in the restraint chair for at least four hours based on the conduct that they were alleged to have committed. But just to be clear, so I'm not sure I disagree with you, but resistance per se is not the be all and end all, right? Because prevention, that's what the marshals are concerned about. They're not concerned about, they're not saying necessarily that this person was acting up before I took him to court and therefore I put him in cuffs to take him to court. They're saying like, look, forget about it. We're putting him in cuffs to take him to court to prevent an outbreak, you know, sort of a disturbance. So prevention, you say, is a valid use of force, right? Use of passive restraint. Okay. Yes, Your Honor. I just want to make sure that I understand. It's not all about resistance. We have like resistance cases and prevention cases. Yes, Your Honor. Okay, got it. And that's why one of the Kingsley factors is were they actively resisting? You know, did the officer try to temper the amount of force used? And that's another factor that goes way in the government's favor here. You're not tempering the force. These people were already isolated. They were already calm. There was no problem. He pulls them out of a cell where they're not causing any problem. It's not so that he's preventing some violence. There's no violence happening. And you have officer after officer testifying. Based on my 20 years of experience, I didn't see any need to put them in a chair. And so the case law is clear. We're all clear on the principle. When someone is not resisting, you can't use force on them. Or, or, or, or. Yes. When there's no reason to believe that there is, you know, sort of imminent threat that you need to prevent. Yes. Right? I would imagine. Or for some other non-punitive. Yes. Okay, good. Got it. So if I understand what you're saying, the use of a restrained chair may but is not ineluctably, not always, excessive. Absolutely. It depends on the context. Yes. In the absence of a threat, in the absence of some palpable reason that you need to do something to restrain or to prevent, the use of a restrained chair becomes excessive. That's your view. Yes, sir. You must have some non-punitive justification for using the chair. And the fallback for the defense has been, well, he didn't even know the use of the chair was a use of force. And, first of all, this Court has never required that the officer receive notice of what force is. And in Piazza, this Court listed, it doesn't turn on such a fine point as kick some punches or pepper spray or restraint. And, frankly, it should be obvious to any reasonable law enforcement officer, without a case, that strapping a man down with a strap across his chest, straps on his shoulders, straps on his legs, handcuffed behind his back for more than four hours requires force. Hill's own policy described it as a use of force. Hill's own officers all testified that they knew it was a use of force. The chair has a warning label that says use of it can cause death or serious injury. And there are other prior restraint cases. As Judge Newsom mentioned, the Williams v. Burton case talked about the use of restraints and treated them as a use of force. Although it was an Eighth Amendment case that didn't find it excessive there because it's a different standard, it clearly treated restraints as force. And Hope v. Peltzer, which Judge Marcus mentioned, that case also, the whole violation there, was pitching the person to a post. Putting someone in a restraining chair is no more passive than pitching someone to a post. There were other aggravating factors there, as you mentioned that they were outside and whatnot. But the Hope v. Peltzer court very clearly held at the end of the opinion the violation was pitching them to the post. And so we know that handcuffs can be forced. And there was notice of that here. One other case that is helpful is the Danley v. Allen case. This court has explained that passively leaving someone in a cell when there was pepper spray in the cell for 20 minutes, that was a use of force there. Quote, the use of force in the form of extended confinement in the small, poorly ventilated pepper spray-filled cell when there were other readily available alternatives was excessive. And so we know that passive is not some magic word. We have a different standard now. That can still be force when you're using restraints or it's passive. All the government is asking here is to reiterate the longstanding principle that we have just discussed, that force cannot be used when there is not some non-punitive reason. Did you have anything you wanted to say in response on the juror issue? Yes, Your Honor. I'm just about to get there. For the jury deliberations, the district court did not coerce the verdict and it did not abuse its discretion in any way. And that's an important place to start. The standard of review for the jury issue is abuse of discretion. It is not the no-go. The first part that they say was problematic was bringing this juror out for questioning. But this court has said in polar and yawn that when there are allegations of juror misconduct, the only way the court can know whether they need to throw the juror off to cure that problem is to interview the juror. And the court has the discretion to do that. And here it did so in response to notes. What about your friend across the aisle's argument that the content of the deliberations was effectively revealed during the questioning? It's just not brought out by the record, Your Honor. As Judge Newsom mentioned in the beginning, the defense is reading a lot into the record. First of all, to even call this juror the single holdout, there's no evidence of that. The evidence is that nobody knew the breakdown. Even defense counsel said during deliberations, we don't know what the score is, whatever the numerical breakdown is. And then the district court, and this is the last time she questioned the foreperson, which was about an hour and a half before the verdicts were returned, said, I'm going to ask you carefully because I don't want you to divulge too much information. And again, as the court instructed you at the end of the trial, you are not to tell me at any point what the breakdown is, the numerical breakdown. It was simply not clear that juror number six was the only juror in favor of acquittal or that there was even a majority or minority in favor of acquittal. We didn't know that. Right, but the judge did know with regard to juror number six because there were multiple notes complaining about a juror, and the complaints were the same complaints, the same category of species of complaints. The complaints fell into the following categories, if I read this record right. First, that the juror didn't seem to be capable of deliberating because he didn't understand what was going on. The second complaint lodged against the juror, obviously the same juror, was that he refused to follow the law. He wouldn't follow the instructions. And every note had a variation on those two themes, if I have it right. Is there any case out there where a jury is deliberating, let's just say we start with the reconstituted jury, which started on that Tuesday morning, where a judge brought a recalcitrant juror or someone against whom a complaint had been lodged out and questioned them twice? I don't know of one that has twice, Your Honor. The reason I ask you the question is I've been unable and I'm unfamiliar with any case where a judge has brought the juror in two times in less than a day and a half to sit him down, separated him from the rest of the jury, and said basically what's going on here. Yes, Your Honor. I have not found a case on that either. But it is the district court's discretion in how to handle and whether to interview someone when there have been jury misconduct allegations. And Your Honor is absolutely right. Those notes, they're not about the deliberations and this person thinks that there should be an acquittal. It was not about the substance of it. They were all, in two of the categories you mentioned, was he capable? We think he's got some mental issues. He's not responding to things that don't make any sense. And the other thing was that he wasn't listening. One of them said that he put his hands over his ears and over his eyes when other jurors were speaking. And then the other thing that said was that, sorry, I forgot the third category, but the bottom line is all the notes wouldn't follow the instructions. At one point he had said, for instance, that he thought that the sheriff and the president were above the law or that he, they said that he was basing, he didn't agree with the law and was basing his vote on that at a different note. So all these, so multiple notes come out the first time and none of them say anything again about the deliberations. They're all just about this juror is not capable. He's not following the law. He's not deliberating. Although I guess from the fact that he said that the note said that the juror said that he thought the sheriff and the president were above the law, we can pretty much infer what his position was, right? Certainly, Your Honor. That's right. We do think he was probably in the, but as we know now from the record, the first jury, which he was a part of, had reached two verdicts and was hung on five. And we know from that point that he had already voted to convict on one of the counts. And so we can't read too much into what is happening behind the scenes, which is what the defense wants to do. No, but I think the thrust of the argument goes beyond that. And maybe you can help me with it. As I see the heart of the argument, it's that you can understand the judge bringing a juror in who refuses to follow the law or about whom there's a question whether he is sufficiently competent to perform the role of a jury or indeed even if he refuses to deliberate with his colleagues. But all of those complaints had been lodged before round one, before the first time the juror is questioned. So the judge has that information in front of her. She brings out the foreperson. The foreperson essentially elaborates on those themes. She sends the foreperson back into the jury, and she brings juror six out and asks him about these problems. One time it seems to me the judge is well within her discretion to do this. And she explored all of it. The next day there's another note that says basically the same thing. She brings the juror number six out a second time. What is the purpose of bringing the juror out the second time if the court was satisfied after round one that the jury was sentient, competent, and willing to follow the instructions? Why would you bring the juror in a second time, particularly only an hour after you had given the jury a second hour instruction? Because, Your Honor, and this is why we give district courts so much discretion. Because she was there for that first round of questioning with the juror, and while she was convinced that it wasn't at a point that she was going to excuse him, she still had questions. She wasn't 100% sure. And so when she got more notes, 100% sure of what? His competence, his willingness to deliberate, or his willingness to follow the law? All of the above, Your Honor. And the reason she wasn't 100% sure, she was to a point that she was not willing to throw him off the jury, send him back. But then when she gets these same complaints, and I believe it was two more notes, saying with different specifics, it's not the exact same, that he is not deliberating, he is not following the law. She is the one who's there. She's the one who has to make this call, and she just brings him out. And if you read the colloquy, it's a very friendly, very nothing coercive. The defense hasn't even alleged that anything she said to him was coercive. She just asks him again, Hey, are you following the law? Is there anything you don't understand that you want me to explain? And he says no, and they move on. Let me ask you this. Is there any significance that we ought to attach to the fact that the Allen charge is given that Wednesday at 1.32 p.m., and less than one hour later, 2.29 p.m., the note comes out, the jury refuses to follow the law, and you bring that same juror out a second time? The timing itself was pretty close to the actual giving of an Allen charge twice. Your Honor, this Court has said in Anderson that an hour and a half between an Allen charge and the verdict, and I know we're talking about questioning, shows that the jury was deliberating and that the minority didn't roll over. And so we have a full hour and a half. No, no, my concern is not that there wasn't enough time for them to deliberate. That's not the heart of my question. The heart of my question goes to the confluence of calling the same juror out two times, the second time where the allegation is exactly the same as the first time and the judge had an opportunity on Round 1 to discern whether the juror was competent and whether the juror was willing to follow the instructions. And I'm just having trouble understanding what the purpose was on Round 2 and what its impact would have been on Round 2. It just strikes me that the argument of coercion perhaps takes on a different patina here with the sequence of events. What am I missing? Wouldn't it be perceived as coercive for a juror to be hauled into the courtroom alone twice and asked basically the same kind of question twice within really a day? No, Your Honor, because these questions, again, are not about this isn't like a rooster case where you're trying to get a jury to go to a certain verdict. You know you have one holdout. Again, you don't know you have a holdout. The court specifically tailored its second Allen charge. It took out the criticisms in U.S. v. Wray about the minority needs to reconsider their opinion and that the jury was taxing. That's what the defense complains about, but that wasn't even in that Allen charge. The court took that out, and it's not only, so it's not directed at this juror. It doesn't have the language that this court has, you know, even though it's approved Allen charges in the pattern, it took out the things that could be coercive. And so you have an Allen charge, which there's nothing indicating there's anything coercive about it. Then you have a full hour and a half, which, again, I know that that's until a verdict. We know they're deliberating. And the questioning with the juror, he explains that he's good faith deliberating. The defense counsel acknowledges that these notes show there's a fruitful debate going on. No one has been coerced. And then you have another hour and a half after that before you get the verdict. And so you have two sets of time that are way beyond what this court has ever said would indicate that there had been coercion. Thank you. Thank you, counsel. All right, Ms. Barron. Thank you, Your Honor. And I want to pick up right where the government left off. The government stated that there had been repeated evidence that fruitful debate was going on and that that's what this inquiry was about, to make sure that fruitful debate had been going on and that this individual had been engaging in deliberations. But I want to remind the court that, first of all, we knew that fruitful debate had happened because he had participated in the reaching of two unanimous verdicts, which implies that he understood the law and was capable of applying the facts to that law. But more importantly, the first time that poor man was brought out for questioning, he described in detail what he had been enduring from his fellow colleagues. They were screaming at him, cutting him off, calling him names, calling him incoherent and crazy. That is not fruitful debate, Your Honors. That is bullying. And we knew that after the first questioning. But the judge kept sending him— Do you suppose jurors haven't been arguing with themselves at a high decibel rate for centuries? I'm sure they have, Your Honor. And, you know, if it's screaming versus raised voices, that's one thing. But when you've got 11 people ganging up on one person and calling him crazy and incoherent— How do we know there were 11 people ganging up on him? Is that in this record? Well, we know by the time he comes out that he is the holdout juror. And we don't know how many were screaming at him, if you're correct. I mean, this record should never have been made. We know way more than we should. But we at least know that some of the jurors were screaming at him and calling him epithets. And I would say that that is a sign of juror dysfunction. And that's the problem with what the court did here. And I understand why the government wants this court to look at every decision the judge made in a silo under an abuse of discretion standard. Because if we look at individual decisions, then it's hard to deny the discretion. But under Brewster v. Hetzel, we have to look at the cumulative effect of everything that happened, everything that led up to his decision to change his verdict in that last 80 minutes of a four-day hearing. Let me ask you two questions in that regard. The judge brings jurisdicts out twice. Is there anything about the questioning by the judge itself that was coercive? Not that second time. And the questioning by the judge was not overtly coercive ever. I mean, we're not saying that. What did the judge, just for the record, what did the judge say to the juror on each of the two occasions? The first time, I'm going to go back to my timeline, the first time the judge was asking him whether he understood the law, whether he was following the law, whether he was engaging in deliberations with his fellow colleagues. And he answered yes. So her specific questioning, we're not contending that she was abusive in her questioning. How about on round two? Nothing in her words that was inherently abusive. But that's not the issue. The act of bringing him out and singling him out right after that Allen charge had been given made it clear to him that there had been concerns about him and whether he was doing his best to reach a verdict. And 80 minutes later, he gives in to the pressure as anybody would. And so that's why we believe the decision was coerced. Let me ask one final question, at least from me. The second Allen charge was given on Wednesday at 1.32 p.m. It's really the first Allen charge to this reconstituted jury, right? The first to the newly reconstituted. Right. The jury was reconstituted on Tuesday morning. One juror had an ailment of some kind. A substitute went in. And so the full reconstituted jury only heard it one time, although 11 of them would have heard it twice. That's right. Why did the judge give the instruction on Wednesday? There was no statement they were deadlocked at that point, right? No, Your Honor. And, in fact, it goes back to Tuesday night. The judge told us Tuesday at the end of the day that she was going to give the Allen charge a second time. And we filed an extensive motion opposing that. We talked about Brewster v. Hetzel. We told her about Fossler, that we believed she was inching towards coercing a verdict. We made argument Wednesday morning. Without discussion, she says, denied. No discussion at all. And, Your Honor, we believe that that juror's right to hold out is a crucial part of the criminal justice system, that this judge treated him as a problem to be managed rather than as evidence that the government had failed to prove its case beyond a reasonable doubt. And for that reason, Your Honor, we ask that this court reverse. Thank you, counsel.